Filed 3/28/25  Singer v. Greystar California CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LESTER SINGER et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>GREYSTAR CALIFORNIA, INC.,<br><br>Defendant and Respondent. | B330592<br><br>(Los Angeles County<br>Super. Ct. No. BC709021) |

APPEAL from the judgment and an order of the Superior Court of Los Angeles County, Upinder S. Kalra, Judge.  Affirmed.

DRE Law, James Miller; and Darren M. Richie for Plaintiffs and Appellants.

Thomas | Lucas, Timothy D. Lucas, Vanessa C. Whirl and Nathan E. Sawkins for Defendant and Respondent.

Plaintiffs and appellants Lester Singer and his now wife, Monica Mercado, sued Greystar California, Inc. (Greystar), the owner and operator of the Watermarke Tower (the Watermarke), an apartment building at which they are former tenants,[1] for negligence and intentional infliction of emotional distress (IIED). Their lawsuit alleged that, during a Superbowl party Greystar was hosting at the Watermarke, and in the presence of Mercado, an Airbnb[2] guest assaulted Singer, causing Singer physical injury and both plaintiffs emotional distress.  The court entered judgment in Greystar's favor on all claims after granting a motion for nonsuit at the conclusion of plaintiffs' opening statement.

---

[1] The lawsuit is captioned as one against "Greystar Real Estate Partner, LLC" and unnamed Doe defendants.  The record does not reflect the relationship between Greystar Real Estate Partner, LLC and the sole respondent Greystar California Inc. Lower court documents in the record reference multiple defendants but do not discuss the disposition of the action as to Greystar Real Estate Partner, LLC.  Neither respondent nor appellants addresses this discrepancy, nor does either clarify the fate of additional defendants in the action, if any exist. Because the judgment appealed from is solely in favor of respondent Greystar California Inc. on all plaintiffs' claims against it, however, this discrepancy does not affect our analysis on appeal.

[2] "Airbnb . . . is an online marketplace that connects [persons who want to provide] short-term rentals . . . with renters seeking accommodations for 30 days or less." (*Coastal Protection Alliance Inc. v. Airbnb, Inc.* (2023) 95 Cal.App.5th 207, 212.) Although those staying at the Watermarke through Airbnb were also renters, to avoid confusion, we refer to them as guests.

On appeal, plaintiffs argue the judgment must be reversed as to the negligence claims, because the court reversibly erred in concluding the evidence could not establish Greystar had a duty to protect them from physical assault by an Airbnb guest, either by employing additional security guards or by enforcing the lease prohibitions on Airbnb rentals.  Plaintiffs also argue that the entire judgment should be reversed because the judge was biased against them.

We disagree and affirm.

## BACKGROUND

Plaintiffs do not challenge the court's nonsuit ruling on their IIED claims; rather, they argue the court reversibly erred in granting nonsuit on their negligence claims.[3]  Plaintiffs argue they proffered facts that established Greystar owed them a duty supporting these claims on two distinct theories:  one based on their special landlord-tenant relationship with Greystar, and another based on Greystar creating the risk of the harm plaintiffs suffered by allowing Watermarke apartments to be rented by Airbnb guests.

---

[3] Plaintiffs' appellate briefing does not include any argument regarding the IIED claims, and their reply brief expressly disclaims any argument on appeal regarding their IIED claims.  We therefore understand plaintiffs' counsel's representations, made during the hearing before this court, that plaintiffs' appeal includes the ruling on the IIED claim as referring to their argument that, because of purported judicial bias in the proceedings, the entire judgment must be reversed as a matter of due process.

## A.    Proffered Evidence

In reviewing an order granting nonsuit at the conclusion of a plaintiff's opening statement, we, like the trial court, " ' "must accept all facts asserted in the opening statement as true and must indulge every legitimate inference which may be drawn from those facts." ' " (*Carachure v. Scott* (2021) 70 Cal.App.5th 16, 25; *Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583.)  Applying this requirement to the evidence plaintiffs identified in or incorporated by reference into their opening statement,[4] we assume that plaintiffs could have proven the following facts:

### 1.    *Criminal Activity and Airbnb Rentals at the Watermarke*

Watermarke is a luxury apartment complex which requires its prospective tenants to undergo financial and background vetting.  Although allowing Airbnb rentals violated the lease agreement, Greystar knowingly permitted many apartments to

---

[4] In ruling on Greystar's motion for nonsuit after plaintiffs' opening statement, the court agreed plaintiffs could "incorporate by reference" into their opening statement the deposition testimony of both plaintiffs, a five-minute video (presumably of the incident), and the evidence outlined in an offer of proof plaintiffs had made before trial.  The offer of proof states that it is identifying all evidence supporting, inter alia, the bases for Greystar's duty to either plaintiff; defendants' "notice of . . . criminal activity, [and the] incident," "foreseeability," and "that [Singer's] assailants were . . . present [at the Watermarke] as Airbnb guests."  (Capitalization omitted.)  Before ruling on the nonsuit motion, the court also gave plaintiffs an opportunity to identify "[a]nything else [plaintiffs] want[ed] to add to that . . . to meet the threshold of substantial evidence."

be so leased.  Further, Greystar did not require Airbnb guests to undergo any vetting.  Some Greystar employees also provided Airbnb guests with tours of the building and keys to access the building and amenities.

Greystar tenants reported to at least one Greystar employee that persons other than tenants[5] were engaging in illegal activities on a regular basis, causing the tenants to feel unsafe.  Specifically, tenants reported, and the employee himself witnessed, nonresidents using and selling drugs, nonresidents in possession of weapons, and the pervasive smell of marijuana use in common areas.  One tenant complained to the employee about the number of unfamiliar people in the building, and that "these people looked like gang members with face and body tattoos and would lurk near the elevators and common areas; [the tenant] told [the employee] that [the tenant] and [his] wife were constantly scared."  This tenant also complained about "illegal porn[ography] that was being shot in the penthouse unit next to him . . . .  He said he and his family would see thin[g]s left in the hallway such as sex toys and props."  Tenants also reported that an illegal gambling operation was being run in an Airbnb rental.  "The unit above and below would complain about noise and the smell of alcohol and marijuana coming from that unit," and the Greystar employee "saw girls coming out of [the] unit drugged and chaotic."

When an employee on multiple occasions reported these complaints and/or his own observation of illegal activities to his supervisor or upper management, they instructed him not to

---

[5] Except as noted, the Greystar employee declaration supporting these facts does not specify whether the nonresidents were Airbnb guests or not.

intervene and not to call the police. Plaintiffs also represented in their opening statement that they could have presented evidence that "Greystar promised their tenants a safe building . . . [and] that to effectuate that promise, . . . [Greystar] promised to provide them adequate 24-hour security, and also that no unaccompanied nonregistered guests would be permitted in the building, that no short-term rentals like Airbnb . . . would be allowed[, and] that even registered guests would not be permitted to use the building's amenities like . . . the media room without being accompanied by a resident." Although plaintiffs repeat this representation in the briefing on appeal, at the hearing before this court, plaintiffs' counsel conceded that the evidence did not support that Greystar made such an express promise in response to the purported reports of criminal activity.

According to testimony of a Watermarke security guard plaintiffs represented they could offer at trial, "the short-term renters at the building put[ ] a strain on the security that led to it [presumably, the security] being inadequate" to prevent the assault on Singer, and "had there been additional security or had the restriction on short-term renters been enforced, then those guests would not have been there and this incident would not have occurred."

## 2. *2018 Superbowl Party at the Watermarke and the Assault on Singer*

In 2018, Greystar hosted a Superbowl party in the media lounge room, one of the common areas in the building. Two security guards were on duty, the same number who normally worked each day. Greystar did not ban or attempt to prevent Airbnb guests from attending the party, nor was the guard

assigned to the lobby requiring nonresidents to sign in before entering the building.

Although plaintiffs did not attend the party, they did bring business associates to the media lounge "so they could order . . . food and continue to network with their group." A group of Airbnb guests wearing football team apparel began threatening and taunting plaintiffs. One of them stated, " 'we stab Mexicans around here.' " Singer, Mercado, and their business associates "took the statement[s] as a threat to their safety and began yelling back at [the Airbnb] guests." An Airbnb guest began "yelling and acting in an aggressive manner" and "struck [Singer] . . . with such force that [Singer] was knocked unconscious." The security guard "was in the middle of the group trying to keep everyone at bay," but "a large physical brawl commenced" during which the guard was also injured.

As a result of being assaulted, Singer sustained physical injuries and suffered emotional distress. Mercado witnessed the assault and suffered heart palpitations and emotional distress as a result.

### B.    Discussion

"A motion for nonsuit is a procedural device which allows a defendant to challenge the sufficiency of plaintiff's evidence to submit the case to the jury." (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117.) The defendant "may move for a judgment of nonsuit" "after . . . the plaintiff has completed his or her opening statement, or after the presentation of his or her evidence in a trial by jury." (Code Civ. Proc., § 581c, subd. (a).) We review a court's ruling on a motion for nonsuit de novo. (*Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1060.)

7

"[A]s a general matter, there is no duty to act to protect others from the conduct of third parties." (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 (*Delgado*).) There are, however, exceptions to this rule. (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 215 (*Brown*).) One exception is based on a "special relationship" between a plaintiff and defendant. (*Ibid.*) Another exception is based on a defendant's performing an act that increases the risk of injury to a plaintiff and failing to protect the plaintiff from that risk.[6] (*Brown, supra,* at p. 216; see, e.g., *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 49 (*Weirum*).)

Plaintiffs argue that, based on their landlord-tenant relationship with Greystar, Greystar had a duty to protect them from the assault by either hiring additional security guards or enforcing the lease's Airbnb prohibition. Plaintiffs also argue that, separate and apart from the duty Greystar owed them as their landlord, Greystar had a duty to protect them from being assaulted at the Superbowl party because Greystar created the risk of assault by hosting the party without providing sufficient security guards and/or restricting Airbnb attendees.

---

[6] This latter situation "does not represent a true exception . . . . Rather, it involves more than a mere failure to protect (nonfeasance), and instead involves both misfeasance— the defendant has 'ma[de] the plaintiff's position worse, i.e., defendant has created a risk'—and the nonfeasance of failing to protect against that risk once created." (*Jane Doe No. 1 v. Uber Technologies, Inc.* (2022) 79 Cal.App.5th 410, 424–425 (*Uber*), italics omitted.)

### 1. *Duty Based on Landlord-Tenant Relationship*

#### a. *Applicable Law*

"A landlord generally owes a tenant the duty, arising out of their special relationship, to take reasonable measures to secure areas under the landlord's control against foreseeable criminal acts of third parties." (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213 (*Castaneda*), citing *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1189–1190 (*Sharon P.*) ["landlord['s] . . . general duty of maintenance includes 'the duty to take reasonable steps to secure common areas against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures,' " italics omitted] & *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 (*Ann M.*) [same].) But "even when a special relationship gives rise to an affirmative duty to protect, a court must still consider whether the [foreseeability and] policy [factors] set out in *Rowland* [*v. Christian* (1968) 69 Cal.2d 108, 112–113 (*Rowland*)] warrant a departure from that duty."[7] (*Brown, supra*, 11 Cal.5th at p. 222.) "In evaluating whether a business is under a duty to provide

---

[7] The *Rowland* factors include " 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1143 (*Kesner*), quoting *Rowland, supra*, 69 Cal.2d at p. 113.)

precautionary measures to protect patrons against potential third party criminal conduct, past California [Supreme Court] cases generally have looked primarily to . . . (1) the degree of foreseeability that the danger will arise on the business's premises and (2) the relative burden that providing a particular precautionary measure will place upon the business." (*Verdugo v. Target Corp.* (2014) 59 Cal.4th 312, 338 (*Verdugo*); see *Ann M., supra*, 6 Cal.4th at pp. 678–679 ["a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures"]; accord, *Castaneda, supra,* 41 Cal.4th at p. 1213; *Sharon P., supra*, 21 Cal.4th at pp. 1189–1191.) Although "other *Rowland* factors may come into play in a given case, . . . the balance of burdens and foreseeability is generally primary to the analysis." (*Castaneda, supra,* at p. 1214.) Here, plaintiffs do not contend we should consider "other" *Rowland* factors.

"If the relative burden of providing a particular precautionary safety or security measure is onerous rather than minimal, the governing cases have held that absent a showing of a 'heightened' or 'high degree' of foreseeability of the danger in question, it is not appropriate for courts to recognize or impose a common law duty to provide the measure. (See, e.g., *Ann M., supra*, [6 Cal.4th] at p. 679; *Delgado, supra*, [36 Cal.4th] at pp. 243–244, fn. 24; *Castaneda . . . , supra*, [41 Cal.4th] at p. 1213.) These decisions implicitly recognize that, in the absence of such heightened foreseeability, the determination whether a business (or businesses in general) should be required to provide a costly or burdensome precautionary safety measure to protect against potential future third party criminal conduct should more appropriately be made by the Legislature rather than by a jury

10

applying a general reasonableness standard in a particular case." (*Verdugo, supra*, 59 Cal.4th at pp. 338–339.)

Plaintiffs' argument to the contrary notwithstanding, balancing these factors to determine whether the facts plaintiffs contend they can prove are sufficient to support a duty is a question of law, not a question of fact for the jury to decide. (*Castaneda, supra,* 41 Cal.4th at p. 1213 ["the existence and scope of a property owner's duty to protect against third party crime is a question of law for the court to resolve"].)

### b. *Analysis*

Because characteristics of the specific protective measures a plaintiff proposes are key to the scope of a landlord's duty to protect, in assessing Greystar's duty, "[w]e begin by identifying the specific action or actions plaintiff['s] claim[ ] [Greystar] [was] obliged to take to protect [them] from [the assault Singer suffered]." (*Castaneda, supra*, 41 Cal.4th at p. 1215.)

#### i. *Providing additional security guards*

Plaintiffs argue Greystar had a duty to hire additional security guards as a means of preventing the type of violent assault Singer suffered. Plaintiffs make no arguments regarding the cost or burden of providing such additional security. We could consider that failure alone as conceding that hiring additional security guards would be significant financial burden. In any case, in *Ann M., supra*, 6 Cal.4th 666, the California Supreme Court held that "the hiring of security guards . . . will rarely, if ever, be found to be a 'minimal burden.' The monetary costs of security guards [are] not insignificant. Moreover, the obligation to provide patrols adequate to deter criminal conduct

11

is not well defined. 'No one really knows why people commit crime, hence no one really knows what is "adequate" deterrence in any given situation.' " (*Id.* at p. 679.)

Having concluded that providing security guards to protect tenants from third party crime places a significant burden on landlords, the *Ann M.* court further held that "a high degree of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards." (*Ann M., supra*, 6 Cal.4th at p. 679.) This "degree of foreseeability rarely, if ever, can be proven in the absence of prior *similar* incidents of violent crime on the landowner's premises." (*Ibid.; Sharon P., supra*, 21 Cal.4th at pp. 1195-1196.) Applying this heightened foreseeability requirement, the court held that the evidence presented did not establish the harm plaintiff alleged—being raped on the landlord's property— was sufficiently foreseeable to impose on the landlord the significant burden of hiring security guards. (*Ann M., supra*, at pp. 672–674.) The court explained that the plaintiff had offered no evidence that the landlord was aware of "*violent* criminal acts prior to*" the rape. (*Id.* at p. 680, italics added.) The court further stated that, even if the landlord had been aware of earlier incidents of violent crime on the property, unless those incidents were "similar in nature to the violent assault that [plaintiff] suffered," they would not provide "sufficiently compelling" evidence "to establish the high degree of foreseeability necessary to impose upon [the defendant] a duty to provide security guards in the common areas." (*Ibid.*)

The high court performed this same analysis and reached the same conclusion in *Sharon P., supra,* 21 Cal.4th 1181. In that case, plaintiff sued the owner of a garage in which she

12

rented a parking spot after she was sexually assaulted at gunpoint in the garage. (*Id.* at p. 1185.) The court concluded that, under the applicable heightened foreseeability standard, because "no assaults had occurred on the premises during the 10 years preceding the attack upon plaintiff," the "landlords' duty of care to their tenants" [did not] require[ ] that they provide security in the garage. (*Ibid.*) Although plaintiff had offered evidence of several prior armed robberies—including one involving physical injury (*id.* at p. 1186)—these had "specifically targeted a bank elsewhere on the premises and did not involve violent attacks against anyone, [and thus] were not sufficiently similar to the sexual assault inflicted upon plaintiff to establish a high degree of foreseeability that would justify the imposition of such an obligation." (*Id.* at p. 1191.)

Thus, except in "rare[ ]" cases (*Ann M., supra*, 6 Cal.4th at p. 679), California Supreme Court precedent requires prior acts of violent crime and/or crime "similar in nature to the violent assault [on Singer]" in order to establish the level of foreseeability necessary to include employing security guards as part of the duty Greystar owes its tenants to protect against third party crime. (*Ann M., supra*, at p. 680; *Sharon P., supra*, 21 Cal.4th at p. 1191.) The activities by Airbnb guests reflected in the proffered evidence—drug use, gambling, weapons possession, the appearance of gang affiliation and loitering in common areas—are neither violent nor similar to the assault Singer describes.[8] Nor have plaintiffs even attempted to identify any

---

[8] The proffered evidence does not attempt to show that Airbnb guests engaged in all of the complained of activities, but rather that nonresidents did. In context and giving plaintiffs

basis on which to conclude that their proffered evidence reflects the type of "rare[ ]" circumstances alluded to in *Ann M.*, in which a plaintiff might be able to establish the requisite level of foreseeability without prior instances of similar or violent crime. (*Ann M., supra*, at p. 679.) To the contrary, plaintiffs offer no analysis distinguishing this case from *Ann M.* or *Sharon P.*, nor do we see any basis to do so. Plaintiffs have thus failed to satisfy the applicable heightened foreseeability requirement.

In arguing to the contrary, plaintiffs cite cases for the general principle that prior *identical* incidents of alleged harm are not necessary for a risk of that harm to be foreseeable. (See *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57–58, ["it is settled that what is required to be foreseeable is the general character of the event or harm—e.g., being struck by a car while standing in a phone booth—not its precise nature or manner of occurrence"]; *Kesner*, *supra*, 1 Cal.5th at p. 1146 [applying *Bigbee* and concluding employer defendants "would not need to know the 'precise . . . manner' that exposure [to asbestos] occurred" in order for it to be foreseeable that those working at an asbestos-affected areas could "leav[e] an area with airborne dust-based toxins and then com[e] into contact with members of their households"].)

We do not disagree that identical prior instances of crime are not necessary—even under the heightened foreseeability standard. But plaintiffs have failed to identify even prior instances of *similar* crimes, as required by the express holdings of *Ann M.* and *Sharon P.*, cases the California Supreme Court

---

the benefit of the doubt as to what they meant to proffer, we assume, for the purposes of argument, that they could prove the nonresidents engaging in these activities were Airbnb guests.

has cited with approval as recently as 2014. (See *Verdugo, supra*, 59 Cal.4th at p. 338.) Under the holdings of these cases, the duty plaintiffs ask us to impose will "rarely, if ever" be justified, absent such a showing. (*Ann M., supra*, 6 Cal.4th at p. 679.) But, as noted, plaintiffs do not argue, nor do we see any basis for concluding, that the facts they contend they can prove present such rare circumstances.

Plaintiffs also rely on the following language in *Delgado, supra*, 36 Cal.4th 224: "[O]nly when 'heightened' foreseeability of third party criminal activity on the premises exists—shown by prior similar incidents *or other indications of a reasonably foreseeable risk of violent criminal assaults* in that location—does the scope of a business proprietor's special-relationship-based duty include an obligation to provide guards to protect the safety of patrons." (*Id.* at p. 240, italics added & omitted.) They appear to argue that the reference to "other indications of . . . violent criminal assaults" permits them to establish a duty without proof of prior similar crimes. But plaintiffs do not identify facts providing any such "indications of a reasonably foreseeable risk of violent criminal assaults [at the Watermarke]." (*Ibid.*) In any event, comparing the evidence presented in *Ann M.* and *Sharon P.* with the evidence plaintiffs proffered here, we reach the same conclusion as did the high court in those cases: As a matter of law, the evidence cannot support the level of foreseeability necessary to impose a duty to protect against third party crime by providing security guards.

ii. *Preventing use of Watermarke apartments as Airbnb rentals*

Plaintiffs also appear to argue that Greystar owed them a duty, based on the landlord-tenant relationship, to prevent

15

apartments at the Watermarke from being used as Airbnb rentals. As to the specific ways in which plaintiffs contend Greystar should have done this, plaintiffs do not identify anything beyond Watermarke security enforcing the restriction by refusing access to non-tenants not accompanied by a tenant. Again, we must "balance[e]. . . 'foreseeability' of the criminal act[ ] [that injured plaintiffs] against the 'burdensomeness, vagueness, and efficacy' of [preventing Airbnb rentals]." (*Ann M., supra*, 6 Cal.4th at p. 679; accord, *Verdugo, supra,* 59 Cal.4th at p. 338.)

In *Sharon P.*, *supra*, 21 Cal.4th 1181, the Supreme Court considered whether, even if the sexual assault was insufficiently foreseeable to impose on the landlord a duty to hire security guards, it was sufficiently foreseeable to justify requiring the landlord to take other protective measures. (*Id.* at pp. 1195–1196.) Specifically, the plaintiff argued the landlord had a duty to "keep the tenant garage brightly lit and clean, . . . hook up a previously installed security camera located over the elevator of the garage, and . . . require existing personnel to periodically walk through the garage." (*Id.* at p. 1196.) But the court "questioned whether such other measures, in reality, would be significantly less burdensome than the hiring of guards (*id.* at pp. 1196–1197), and [thus] applied the heightened foreseeability test." (*Delgado, supra*, 36 Cal.4th at p. 239 [summarizing and relying on *Sharon P.*].) Thereunder, "absent any prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location, [the court] [could not] conclude defendants were required to secure the area against such crime," even with the additional measures plaintiff identified. (*Sharon P., supra*, at p. 1199.)

16

Plaintiffs do not expressly argue that enforcing the Airbnb ban is a less burdensome means of protecting against assault than is hiring additional security guards. Nevertheless, even if it is, *Sharon P.*'s analysis of purportedly less burdensome protective measures is dispositive here. Like the additional measures the plaintiff proposed in *Sharon P.*, tasking Watermarke security guards with assuring units are not used as Airbnb rentals and that Airbnb guests are denied access to the property would be at least as burdensome as the alternative measures the court considered in *Sharon P.*; that is, providing brighter lighting in a garage, activating and monitoring previously installed security cameras, or requiring existing personnel to perform additional patrols. (*Sharon P., supra*, 21 Cal.4th at pp. 1195–1199.) Moreover, the scope of the obligation to require Watermarke security guards enforce the prohibition on Airbnb rentals, like the obligation to prevent criminal conduct, "is not well defined"— a consideration the court noted in explaining the heightened foreseeability standard in *Ann M.*— because the extent and nature of the efforts necessary to do so effectively are unclear. (*Ann M., supra*, 6 Cal.4th at p. 679.) We thus hold that the court correctly concluded plaintiffs had not identified evidence sufficient to justify imposing a duty on Greystar to enforce the Airbnb prohibition as a means of protecting against assault by Airbnb guests.

### 2. *Duty Based on Creation of Risk of Harm*

A necessary corollary to "[t]he general rule that one has no duty, absent a special relationship, to protect others against harm at the hands of third parties" (*Uber, supra*, 79 Cal.App.5th at p. 424) is that when a defendant has affirmatively "created a peril" that foreseeably leads to the plaintiff's harm (*Williams v.*

*State of California* (1983) 34 Cal.3d 18, 23), the defendant can, even absent a special relationship, be held liable for failing to also protect the plaintiff from that peril. (See *Weirum, supra*, 15 Cal.3d at p. 49; *Uber, supra*, 79 Cal.App.5th at pp. 424–425.) The "crux" of such circumstances giving rise to a duty to protect is that the harmful third party conduct " 'was a necessary component' of the [defendant's] conduct at issue." (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 534 (*Melton*).) Where a defendant's behavior merely "create[s] an opportunity" for a plaintiff to face certain risks at the hands of third parties, but does not encourage them to take on those risks, defendant has no duty to protect. (*Uber, supra,* at p. 426.)

In *Melton*, for example, the defendant publicly posted an unrestricted invitation to what plaintiff alleged was an " 'out-of-control and dangerous[ly] public' " party at his residence, rendering it foreseeable that drunken attendees could become physically violent and that party guests might be harmed in a way they would not have been, had the party not taken place and/or been publicly advertised. (*Melton, supra*, 183 Cal.App.4th at p. 533.) This foreseeability and causal connection was insufficient to require the party host to protect against such violence, because "[t]he violence that harmed plaintiffs [in that case] was not 'a necessary component' of [the] defendant[ ] [host's] party." (*Id.* at p. 535; see *ibid.* [rejecting idea that hosting and advertising party in this way constituted "active conduct that increased the risk of harm"].) Thus, even if, as plaintiffs argue, a fist fight breaking out at the Watermarke Superbowl party was "a foreseeable result of [the] defendants' conduct"—that is, of hosting the party with allegedly minimal security and permitting unvetted Airbnb guests to attend—and even if the fight "may

18

not have occurred absent the defendant's actions, . . . [this] is insufficient to establish" Greystar created the risk of harm, because a fist fight is not a necessary component of such a party or of allowing unvetted Airbnb guests to attend it. (*Uber, supra*, 79 Cal.App.5th at p. 427.) As in *Melton*, Greystar hosting a party without restricting the attendees to Watermarke residents or otherwise controlling the behavior of guests did not create the risk that Singer would be assaulted by a guest at the party. Greystar thus did not have a duty to prevent this from happening.

## JUDICIAL BIAS

### A. Relevant Background

Plaintiffs contend that "the judgment must be reversed because [the trial judge] exhibited clear bias [in favor of] . . . and improperly advised [Greystar] on legal strategy and argumentation." We disagree.

Before trial commenced, the trial court expressed concerns about the viability of certain aspects of plaintiffs' case. For example, the court stated that, "as to . . . negligence based upon premises liability, there [was] a question of law for the court as to" duty and foreseeability. The court directed plaintiffs to provide an offer of proof "regarding whether or what duty they are alleging [Greystar] violated and what evidence did they have to demonstrate foreseeability to support that duty." Plaintiffs filed an offer of proof on April 12, 2023.

Thereafter, at an April 14, 2023 pretrial conference, the court again raised concerns about the sufficiency of the evidence—including the evidence identified in the offer of proof. The court cautioned that there needed "to be a measure of foreseeability for the particular harm in this case. And if you

19

[cannot] meet that threshold with admissible evidence, it's a very low threshold, this case will be over at opening."

At this same conference, the court also reiterated concerns it has previously raised about Mercado's IIED claims based solely on witnessing the assault on Singer. The court stated that, if Mercado relied only on what she had offered so far "the extent of the evidence, heads up, [the court was] going to grant a nonsuit . . . as to [Mercado]"—who was not yet married to Singer at the time of the assault—"by the end of the opening statement."

The court explained that it was raising the possibility of a nonsuit so that plaintiffs' counsel could "take appropriate action ahead of time," to give counsel the opportunity to "save . . . some credibility points in front of the jury," and in the interest of judicial efficiency and not wasting the jury's time. Plaintiffs' counsel responded by arguing that Greystar should have raised these issues in a motion for summary adjudication or judgment, and that Greystar's failure to do so entitled plaintiffs to present their evidence to the jury. The court stated that it "can entertain nonsuit" without defendants first making such motions and, therefore, the court was "giv[ing] [plaintiffs] a heads up that [the court] recognize[d] these issues instead of springing it on [plaintiffs] at the end of opening," thereby affording plaintiffs "a fair opportunity to be prepared" and "[f]ind the case law, find the facts."

### B.    Discussion

As the sole authority for their claim of bias, plaintiffs cite canons of judicial ethics requiring that judges "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary" (Cal. Code Jud. Ethics, canon 2), "perform judicial duties without bias or prejudice[, and] . . . not,

in the performance of judicial duties, engage in speech, gestures, or other conduct that would reasonably be perceived as . . . bias [or] prejudice" (*id.*, canon 3(B)(5)).  We agree with Greystar that plaintiffs are making a due process challenge.

"It is 'extraordinary' for an appellate court to find judicial bias amounting to a due process violation.  [Citation.]  The appellate court's role is not to examine whether the trial judge's behavior left something to be desired, or whether some comments would have been better left unsaid, but to determine whether the judge's behavior was so prejudicial it denied the party a fair, as opposed to a perfect, trial." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589 (*Schmidt*).)  The conduct plaintiffs identify does not reflect judicial bias, let alone bias so prejudicial that it deprived plaintiffs of a fair opportunity to make their case.  In arguing to the contrary, plaintiffs note that, "[o]n several occasions, [the judge], of his own volition, introduced the option for [Greystar] to verbally [*sic*] move for nonsuit following [p]laintiffs' opening argument."  The only record support they provide for this assertion is to the transcript of the April 14, 2023 hearing, which does not support their characterization of the court's comments.  Rather, it reflects the court discussing its concerns about the legal validity of plaintiffs' claims and providing plaintiffs an opportunity to be prepared to address these issues.

Plaintiffs next point to the judge's "refus[al] to direct the defendants to properly brief and file a motion for summary judgment or motion for adjudication," and "the court essentially hand[ing] defendants a judgment for nonsuit by laying out the exact arguments [the court] would need to hear in order to grant a nonsuit motion."  (Capitalization omitted.)  Plaintiffs cite no

21

authority for the proposition that Greystar was required to move for summary judgment or adjudication before seeking nonsuit— let alone that the court was required to instruct Greystar to make such a motion.  Nor was it improper for the court to explain its views on the law and evidence, including its view that, unless certain deficiencies were addressed, the plaintiffs would not be able to meet their burden of proof, and that therefore a nonsuit would be appropriate.  (See *Schmidt, supra,* 44 Cal.App.5th at p. 589 ["[m]ere expressions of opinion, based on observation of the witnesses and evidence, do not demonstrate judicial bias"].)

Finally, plaintiffs claim the judge "announced, weeks before the trial commenced, that 'by the end of the opening statement, [the court] intend[ed] to enter a nonsuit as to [Mercado].' " They contend this reflects the judge deciding the issues without first hearing relevant evidence and argument.  This again is a mischaracterization of the court's comments, which when read in full expressly convey that, because the court deemed the evidence plaintiffs identified in their offer of proof insufficient as a matter of law to support Mercado's IIED claim, if, at the conclusion of their opening, plaintiffs had not identified additional evidence on that issue, nonsuit would be appropriate.

The record thus does not reflect judicial bias or misconduct, let alone a denial of due process.  To the contrary, the court provided plaintiffs numerous opportunities to address the court's concerns about deficiencies in their evidence and legal arguments—deficiencies we address in this opinion.  The court's action constitutes a commendable effort to be efficient and assure plaintiffs had a full and fair opportunity to marshal the evidence needed to support their claims.  It does not reflect judicial bias or misconduct of any type.

## DISPOSITION

The judgment and order are affirmed.  Respondent Greystar shall recover its costs on appeal.

<u>NOT TO BE PUBLISHED</u>.


                                    ROTHSCHILD, P. J.

We concur:



BENDIX, J.



WEINGART, J.